UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Lisa Tkal, as Administrator
of the Estate of Christopher Tkal,
Plaintiffs

v.

Case No. 24-cv-0425-SM-TSM
Opinion No. 2026 DNH 155

New Hampshire State Trooper
Noah Sanctuary, in his individual
capacity, and New Hampshire State Trooper
Anthony LaPlaca, in his individual capacity,
Defendants.

**O R D E R**

This civil rights case arises from the February 20, 2022, fatal shooting of Christopher Tkal by a New Hampshire State Trooper, defendant Sergeant Noah Sanctuary. Tkal's wife, Lisa, filed this Section 1983 action against Sanctuary, as administrator of her husband's estate. She alleges that Sanctuary used excessive force against Christopher Tkal in violation of the Fourth Amendment.[1] Defendant now moves for summary judgment. Plaintiff objects. For the reasons that

[1] Lisa Tkal also asserted a Section 1983 claim against New Hampshire State Trooper Anthony LaPlaca on her husband's behalf, based on LaPlaca's purported failure to intervene. She has since agreed to dismissal of that claim. See Document No. 28-7 (Mem. of Law in Opp. to Summary Judgment) at 1.

follow, Sergeant Sanctuary's motion for summary judgment is necessarily granted.

## Standard of Review

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Gattineri v. Wynn MA, LLC, 93 F.4th 505, 509 (1st Cir. 2024) (quoting Fed. R. Civ. P. 56(a)). A genuine factual dispute exists if "the evidence is such that a reasonable jury could resolve the point in the favor of the non-moving party," and a material fact is one "that has the potential of affecting the outcome of the case." Hamdallah v. CPC Carolina PR, LLC, 91 F.4th 1, 16 (1st Cir. 2024) (internal quotation marks omitted). To decide a summary judgment motion, the court draws all reasonable inferences in favor of the nonmoving party from the properly supported facts in the record. Lech v. von Goeler, 92 F.4th 56, 64 (1st Cir. 2024). However, "the 'test for summary judgment is steeped in reality,' so the non-moving party cannot rely on 'conclusory allegations, improbable inferences, and unsupported speculation' to establish a dispute of material fact." To-Ricos, Ltd. v. Productos Avicolas Del Sur, Inc., 118 F.4th 1, 10 (1st Cir. 2024) (quoting Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018)).

## **Background**

The relevant facts, viewed in the light most favorable to plaintiff, are as follows.

Christoper and Lisa Tkal married in 1996. At the time relevant here, they lived together in Walpole, New Hampshire. Their home consisted of three stories, with the kitchen and living space located on the top floor, bedrooms on the middle floor, and a finished basement and garage on the first level. The house had several decks that surrounded the top two floors, connected to each other by stairs, that also accessed the house's yard.

The finished basement was located at the rear of a two-bay garage and ran the width of those garage bays. Two sets of entry doors provided access from the garage into the basement, which was also accessible from the house's interior. The basement entry doors located on the eastern side of the garage were double doors. The two main garage doors each had approximately four windows set linearly along the top third of the doors. Finally, the garage had a side entry door, located on the eastern side of the garage near the main garage doors, allowing direct access from the garage to the outside of the home.

Christopher and Lisa's marriage became increasingly tumultuous. They began to engage in more frequent verbal and

physical altercations.[2] Christopher[3] drank alcohol frequently (Lisa later described him as a "high-functioning alcoholic") and often used marijuana. Before the February 19 incident, Lisa noticed that Christopher seemed increasingly stressed and had been increasingly acting in an aggressive manner. She attributed this, in part, to the long hours he spent working as the Vice President of Operations for Quality and Patient Safety at Cheshire Medical Center, in Keene, New Hampshire, where he was investigating a recent fentanyl diversion that had occurred at the hospital. Christopher was working towards a master's degree, and he suffered from chronic shoulder pain due to arthritis, circumstances which Lisa believed were contributing to his stress.

On Friday, February 18, Lisa inadvertently discovered flirtatious messages Christopher had exchanged with a former co-worker using Facebook Messenger. In relevant part, those messages included pictures of the former co-worker taking a bubble bath. Understandably upset, Lisa opted to wait until the following morning to discuss the messages with Christopher.

---

[2] During her interview with New Hampshire State Police Detectives Amanda Johnson and Holly Rae after the February 19 incident, Lisa described prior abuse incidents that involved strangulation attempts, and assaults with a kitchen cleaver and a knife. See Document No. 26-5 at 5.

[3] Because Christopher and Lisa share the family name "Tkal," the court refers to the parties by their first names.

On Saturday morning, February 19, Lisa confronted Christopher about the messages. They argued, and Christopher eventually left the house for several hours. At some point after Christopher returned home, he made a pitcher of margaritas for them to share. Then, around 8 p.m., they sat down to watch a movie together. While watching the movie, Lisa made a comment that angered Christopher. He left the room and went downstairs to the finished basement (Lisa referred to this area of the house as his "man cave"). When Christopher failed to return from the basement, Lisa became angry. She later met him on the middle floor of the house, and they began arguing. Christopher told Lisa that she should drown herself in a bubble bath. He then returned to the basement, shutting and locking the door behind him.

Incensed, Lisa followed him down the stairs, kicking at the door to the man cave, and screaming at Christopher. After kicking a hole in the door, she threw a broken door piece at him, hitting his hand. She then ran back upstairs to the top floor of the house. Christopher followed shortly thereafter. The argument escalated and Lisa ran downstairs to their bedroom. By this point, Christopher had armed himself with a knife, which Lisa described as a large meat cleaver. He followed Lisa downstairs. Lisa tried to shut the door to their bedroom, but Christopher pushed the door open and held the knife to her

throat. Lisa said to him, "Please don't . . . you have a daughter." Document No. 26-2 (L. Tkal Dep.) at 89:19-21. Christopher then retreated to the basement, taking the knife with him.

Lisa locked herself inside the bathroom attached to their bedroom and dialed 911. Cheshire County dispatch received her call at 11:11 p.m. Lisa told the 911 operator that her husband had held a knife to her throat during an alcohol-fueled argument, and that she was locked in their first-floor bathroom. She reported Christopher was currently in the basement of their home where he had access to firearms, and that Christopher had fired the weapons inside the home in the past to frighten her.

Lisa remained on the phone with the 911 operator as she quietly left the bathroom and made her way to the garage where her vehicle was parked. As she left the house and entered the garage, Lisa could smell that Christopher was (or had recently been) smoking marijuana. Once in her vehicle, Lisa began to back out of the garage and down the driveway. At that time, she was approached by defendant Sergeant Sanctuary.

Lisa's 911 call was routed to the New Hampshire State Police, Troop C, for dispatch. Sergeant Sanctuary and Trooper LaPlaca immediately responded to the Tkal residence in marked cruisers with emergency lights activated. Sanctuary and LaPlaca arrived separately (LaPlaca arriving shortly after Sanctuary),

at approximately 11:30 p.m. Both parked their cruisers in front of the house and armed themselves with rifles. The officers observed Lisa's vehicle as it backed down the driveway and approached the vehicle on the driver's side. They quickly confirmed that Lisa was the driver and convinced her to exit the vehicle (leaving it parked in the driveway). LaPlaca and Sanctuary then escorted Lisa towards their cruisers.

Lisa told Sanctuary and LaPlaca that her husband was inside the house and had attacked her. She said she was in fear of her life, and believed her husband was located in the basement, where he had guns. She gestured with her hands to demonstrate that the guns were long ones, or rifles. Lisa told Sanctuary and LaPlaca that Christopher had threatened her before and had discharged a firearm in the house during an argument, but that she had "never seen him like this. He's gone crazy." Document No. 26-3 (Sanctuary Dep.) at 42:15-17. Sergeant Sanctuary asked Lisa if he could use her phone to contact Christopher, but Lisa was unable to find her phone or remember Christopher's phone number.

As Sergeant Sanctuary and Trooper LaPlaca were escorting Lisa to LaPlaca's cruiser, Officer Joshua Healy from the Walpole Police Department, and Officers Craig Watrous and Robert LaBelle from the Bellows Falls, Vermont, police department arrived at the scene around 11:40 p.m. Cruiser camera footage establishes

that there were limited sources of light on the property. The front entrance of the house was illuminated, however. The evening was cold and clear, with snow on the ground.

Officers Healy, Watrous and LaBelle positioned themselves near the front area of the home, by the front door (or the western side of the house, which faced County Road). Using a loudspeaker, Officer Healy began calling out commands to Christopher, asking him to exit the house. Christopher complied, exiting the home carrying an unidentified object in his hands (possibly a beer glass). He did not appear to be holding a weapon. Officer Healy identified the officers as police and gave instructions to Christopher – something to the effect of "Stay where you are. Let me see your hands." But, contrary to those instructions, at approximately 12:02 a.m., Christopher turned around and re-entered the house.

Trooper LaPlaca, from his vantage point (with Sergeant Sanctuary and Lisa), observed lights flickering on and off in the basement of the home. LaPlaca and Sanctuary finished questioning Lisa and left her secured inside LaPlaca's cruiser. The troopers returned to the property, where the other officers on the scene told them that Christpher had come outside through the front door, seemingly unarmed, had then been given several commands, but Christopher did not comply, and instead returned inside the house.

Trooper LaPlaca and Sergeant Sanctuary positioned themselves on the house's southern side, not far from the two garage doors, and behind a pair of trees approximately 20 feet from the garage. Both garage doors were closed, but Sanctuary could see light coming "from inside the basement area." Document No. 26-3 (Sanctuary Dep.) at 46:13-21. He explained: "we could see light kind of moving through those garage window[s] . . . to indicate there's some kind of movement in there," when a door "would open with a light on inside that door, and so you could see, all of a sudden, the backlighting, and then see a figure move, and then it would go dark again." Document No. 26-3 (Sanctuary Dep.) at 48:2-15.

In an effort to open lines of communication with Christopher, Trooper LaPlaca returned to his cruiser to again ask Lisa for Christopher's phone number. He was joined by Windham County (Vermont) Deputy Sheriff Mario Checchi, who had just arrived on the scene.[4] Lisa had, by then, located her phone, and she gave LaPlaca Christopher's phone number. At this time, she told LaPlaca that Christopher had told her that he was

---

[4] Deputy Checchi's arrival is noted in the Attorney General Office's "Report Regarding the February 19, 2022, Officer-Involved Shooting Incident in Walpole, New Hampshire," ("OIS Report") submitted by the defendant as an exhibit. Both defendant and the plaintiff rely heavily on the OIS Report in support of their arguments. Because neither party objects to the admissibility of the OIS Report, the court considers it as part of the evidentiary record.

going to "end it all," and "put a bullet in [his] head." Document No. 26-4 (LaPlaca Dep.) at 31:13-16. The record does not reveal whether LaPlaca shared this information with Sergeant Sanctuary.

Trooper LaPlaca attempted to call Christopher, but he did not answer the phone. Meanwhile, the Bellows Falls officers continued to "loud hail" Christopher, using a loudspeaker to identify themselves as police officers, and instructing Christopher to come out of the house, with nothing in his hands, unarmed.

Trooper LaPlaca returned to Sergeant Sanctuary's location on the southern side of the house, behind a tree. As he approached Sanctuary's location, LaPlaca observed "the garage. I'm able to see the room with the light on in the furthest back . . . I'm able to see the garage and observe what the garage looks like and the light in the back." Id. at 37:16-22. Deputy Checchi took a position between the Walpole police officers at the front of the house, and Sanctuary's and LaPlaca's position in the back (by the garage doors).

Trooper LaPlaca told Sergeant Sanctuary that he had Christopher's phone number, and Sanctuary instructed LaPlaca to attempt calling Christopher again. LaPlaca did, holding his phone in his hand near his waist (thereby illuminating his position). While the phone was ringing, LaPlaca saw Christopher

exit the garage side entry door, holding what appeared to be a long firearm in his hands in, what LaPlaca described as, "low ready" position.[5] LaPlaca stated that Christopher's arms "were located near his abdomen/chest area, both of them, and his elbows were jutted out while holding a long black object. . . . It's common in that position to be holding a firearm, in my training and experience." Document No. 26-4 (LaPlaca Dep.) at 97:6-18. Deputy Checchi also saw Christopher exit the house through the garage side entry door. He heard Sanctuary say aloud that Christopher was holding a long gun.

Sergeant Sanctuary shifted position, so that he could more clearly see the garage side entry door. He "could see [Christopher] standing there, outside," beside the garage exit door. Because it was dark, Sanctuary illuminated the area with the weapon-mounted flashlight on his rifle and saw "Christopher standing there; he was holding a rifle." Document No. 26-3 (Sanctuary Dep.) at 55:17-21. Sanctuary (and potentially several other police officers) yelled instructions to Christopher, either "don't move," or "drop the weapon."[6]

---

[5] Sergeant Sanctuary described Christopher's hold as "port arms," defined as an individual "holding a rifle diagonally in front of the body with the muzzle point upward to the left."

[6] Recollections vary about the exact message communicated to Christopher in the moment. During deposition in connection with this action, Sanctuary testified that he yelled to Christopher, "Don't move!" But, when interviewed by the New Hampshire

Whatever the specific instruction (don't move, or drop the weapon or gun), Christopher did not comply. Instead, Sanctuary testified, "as soon as I lit him up, [Christopher] then darted back inside the garage." Document No. 26-3 (Sanctuary Dep.) at 55:17-21. Meanwhile, Trooper LaPlaca, suddenly aware that he "didn't have any cover from the tree or concealment," dropped his phone and retreated to another tree about six to ten feet from where he had been standing with Sanctuary. Document No. 26-4 (LaPlaca Dep.) at 95:3-6.

Through the windows on the garage doors, Sanctuary could see that the door on the eastern side of the garage leading to the basement was open, providing a backlight. Sanctuary's rifle light remained lit. He testified:

> I could see [Christopher] go into the garage and then go back into [the furnished basement]. So he was retreating back to the room.
>
> He gets to – into the room, or just before the room; I couldn't really tell the depth perception [because] of – just backlighting. He – he was retreating back to the room.
>
> Then he turns to face directly at me and I could see about his – top of his shoulders upward. And as he's moving I could also see that he still had the rifle

---

Attorney General's office following the incident, Checchi said that both he and Sanctuary had yelled to Christopher to drop his weapon. See Document No. 26-5. And, Bellows Falls Officers Waltrous, LaBelle, and Tuttle each told the Attorney General's office that they heard someone call out multiple commands to Christopher to "drop the gun." Document No. 26-5.

> [because] I could see the muzzle.[7] And he gets there. He then turns around, facing me, and I could see his shoulders – arms kind of lifting up, in a motion of aiming the rifle at me.

Document No. 26-3 (Sanctuary Dep.) at 57:16-58:9.

Sergeant Sanctuary fired his rifle six times at approximately 12:06 a.m. As he fired, he observed Christopher through the garage windows as he moved behind the door frame. Sanctuary followed Christopher's movements with his rifle. Officers at the scene then observed no further movement inside the house, but they continued their efforts to establish contact with Christopher using the loud hailer.

A SWAT team arrived at approximately 1:08 a.m. and opened the garage door. The team located Christopher lying on the floor behind the right-side interior door to the finished basement, which was closed (the left-side door of the double door set was open). Christopher was not responsive. A remote-controlled robot approached and checked Christopher's condition. He was deceased, with his rifle located under his body, the muzzle in front of his head, the grip between his legs.

The bullets that struck Christopher passed through the right-side garage door and the right-side interior door to the

---

[7] The OIS Report notes that Sanctuary's description of Christopher's position at the moment Sanctuary saw the muzzle of Christopher's rifle is consistent with the location where Christopher's rifle scope cover was later recovered (on the floor at the front of the garage). Document No. 26-5 at 13.

basement that his body was found behind (again, the left door of that double door set was open). He had four gunshot wounds: to his head, face, left arm, and back, along with fragment entry wounds due to glass and wood from the doors. A toxicology analysis found ethanol, caffeine, and Delta-9 THC in Christopher's blood, and a blood alcohol level of .165.

The rifle found beneath Christopher's body was later identified as a DPMS Panther Arms Rifle (MAA-6), loaded with 29 rounds in the magazine and an additional round in the chamber. The rifle had been purchased by Christopher on December 17, 2018. Two additional magazines for the rifle were found atop the bar in the finished basement, each loaded with 30 rounds of ammunition, along with a loaded Beretta PX4 Zoom 9mm handgun,[8] and an additional round for the Beretta.

## **Discussion**

Lisa Tkal asserts a Section 1983 claim on her husband's behalf, alleging that Sergeant Sanctuary violated her husband's rights under the Fourth Amendment by using excessive force. Sanctuary argues that he is entitled to judgment as a matter of law because his use of force was objectively reasonable, given the circumstances, and therefore did not violate the Fourth Amendment. But, Sanctuary continues, even if his actions did

---

8 Christopher purchased the Beretta on November 13, 2014.

constitute a violation of the Fourth Amendment, he is entitled to qualified immunity. On this record, it is clear that Sergeant Sanctuary did not apply excessive force and, even if the undisputed facts were construed otherwise, he is entitled to qualified immunity.

1. Violation of a Constitutional Right

"The 'touchstone of the Fourth Amendment is 'reasonableness,' as measured in objective terms." Barnes v. Felix, 605 U.S. 73, 79 (2025) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). "A police officer's use of deadly force violates the Fourth Amendment when it is not 'objectively reasonable.'" Id. at 76 (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). Therefore, the court must determine whether Sanctuary's use of deadly force was "objectively reasonable," or, put differently, "whether the force deployed was justified from the perspective of a reasonable officer on the scene, taking due account of both the individual interests and the governmental interests at stake." Barnes v. Felix, 605 U.S. at 79 (internal quotations omitted).

"[D]eciding whether a use of force was objectively reasonable demands careful attention to the facts and circumstances relating to the incident, as then known to the officer," and "requires analyzing the totality of the circumstances." Barnes, 605 U.S. at 80 (internal quotations

omitted). The inquiry must take into account that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly-evolving – about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. at 397. And, finally, our court of appeals advises that, in making the determination, courts take into consideration the following (non-exclusive) factors:

> "[1] whether a reasonable officer on the scene could believe that the suspect posed an immediate threat to police officers or civilians,'" Est. of Rahim by Rahim v. Doe, 51 F.4th 402, 414 (1st Cir. 2022) (quoting Fagre v. Parks, 985 F.3d 16, 23-24 (1st Cir. 2021)); see also Kisela v. Hughes, 584 U.S. 100, 103 (2018), "[2] whether a warning was given before the use of force and whether the suspect complied with this command," Rahim, 51 F.4th at 414 (citing Kisela, 584 U.S. at 106), "[3] whether the suspect was armed . . . at the time of the encounter or whether the officers believed the suspect to be armed," id. (citations omitted), "[4] the speed with which officers had to respond to unfolding events, both in terms of the overall confrontation and the decision to employ force," id. (citations omitted); "[5] whether the suspect was advancing on the officers or otherwise escalating the situation," id. at 415 (citations omitted) "[6] the suspect's physical proximity to the officers at the time of the use of force," id. (citations omitted), such as whether the individual "was within range to seriously injure the officers at the time they fired," id.; "[7] whether multiple officers simultaneously reached the conclusion that a use of force was required," id., and "[8] the nature of the underlying crime," id. (citations omitted).

Bannon v. Godin, 99 F.4th 63, 78 (1st Cir. 2024) (cleaned up).

Because the court concludes that application of the relevant factors here weighs in Sergeant Sanctuary's favor, plaintiff fails to establish a violation of the Fourth Amendment. As set forth in detail below, an objectively reasonable officer in Sanctuary's position would have understood that he was confronted by a man who was likely under the influence of alcohol and marijuana, who had threatened his wife with a knife, had fired weapons in the house previously, refused lawful commands to submit, reentered his house, armed himself with a rifle, and, when in a darkened garage and able to identify the trooper and his position, appeared to raise the rifle to shoot at the officer. Sanctuary's response was quick, and in self-defense.

A. Reasonable Force: Application of the Multi-Factor Test

Plaintiff concedes that factors three, four, six, and eight weigh in defendant's favor: Christopher was armed; the events unfolded quickly; Christopher was close enough to Sergeant Sanctuary and Trooper LaPlaca to seriously injure or kill either of them; and the troopers were responding to a report that the suspect threatened his wife by holding a kitchen cleaver to her throat. But, plaintiff argues, the remaining four factors are either disputed, or favor the plaintiff, and support her claim that Sanctuary violated Christopher's Fourth Amendment rights.

The evidentiary record before the court, however, does not support plaintiff.

Factor Seven. Plaintiff says that factor seven – whether multiple officers reached the conclusion that the use of force was required – favors Christopher because the determination that force was required was made by Sanctuary alone. Sergeant Sanctuary was the only officer who fired his weapon, but that was due (at least in part) to the fact that Trooper LaPlaca was occupied at that moment seeking cover. As Trooper LaPlaca testified, "[at that moment,] I was in fear of bodily injury. So I positioned myself in a safer location before I even attempted to look up again." LaPlaca further stated that he believed that Christopher was going to shoot him: "If I didn't [believe Christopher was going to shoot me], I'd probably stay out in the open." Document No. 26-4 (LaPlaca Dep.) at 64:16-19. Trooper LaPlaca also noted that, at the moment he heard shots fired from his new vantage point, he had been preparing to raise his own rifle. See, e.g., Conlogue, 906 F.3d at 156 ("In considering whether an objectively reasonable police officer would have used deadly force, the fact that two other police officers on the scene also were about to fire supports the objective reasonableness of [the officer's] decision.") (citation omitted).

For these reasons, factor seven does not weigh in plaintiff's favor.

Factor Five. Plaintiff argues that factor five – whether the suspect was advancing on officers or escalating the situation – weighs in favor of Christopher because, she says, he was retreating to the garage and his man cave. But, the evidence in the record does not show that Christopher was "retreating." As the defendant points out, on this record, whether Christopher was retreating to the garage is debatable.

After disregarding police instructions and instead returning inside the home, Christopher armed himself with a loaded rifle. He was next seen standing beside the garage, in the dark, holding that rifle in "ready position." He was instructed to either drop his weapon, or not to move. He did neither. If, as plaintiff argues, Christopher actually intended to deescalate the situation, he would have dropped the rifle with which he had just armed himself and surrendered to the police officers. Instead, he deliberately ignored their commands, and, after he was illuminated by Sergeant Sanctuary's rifle light, moved quickly back into the garage, still carrying the rifle.

When Christopher moved back into the garage, Sanctuary testified that he believed Christopher was repositioning himself to gain a tactical advantage. He stated: "I know that

[Christopher's] now maneuvering on us, coming out the backside [of the house] where it's dark, where he thought we weren't. And now he had armed himself, and now he is retreating back into a . . . more of a tactical location." Document No. 26-3 (Sanctuary Dep.) at 62:24-63:25. Moments later, Sergeant Sanctuary watched Christopher turn, raise his rifle, and take aim at LaPlaca and Sanctuary. Christopher's actions were not those typically taken by one who seeks to deescalate a dangerous situation.

But, even assuming that the record could support a finding that, in the moment, Christopher intended to escape or to retreat, that fact is unlikely to have altered an objectively reasonable officer's conclusion that, under the circumstances, Christopher posed an imminent, and potentially lethal, threat to the officer's safety, had he fired.

In Brosseau v. Haugen, 543 U.S. 194, 197–98 (2004), the Supreme Court instructed that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." In Brosseau, a police officer was pursuing a suspect who ran to his car where, the officer suspected, he intended to retrieve a weapon. After following the suspect to the vehicle, and demanding that he exit, the suspect started his vehicle and

began to drive away. As he drove away, the police officer fired one shot at the suspect, hitting him in the back. She explained later that she fired at the suspect "because she was 'fearful for the other officers on foot who [she] believed were in the immediate area, [and] for the occupied vehicles in [the suspect's] path and for any other citizens who might be in the area.'" Brosseau, 543 U.S. at 197.

Assuming, as plaintiff argues, that Christopher – at the moment – intended to retreat, Brosseau teaches that, if Sanctuary had reason to believe that Christopher posed a threat of serious physical harm when he turned and raised his rifle, it was not constitutionally unreasonable to prevent that impending harm by employing deadly force. And, by the time Christopher appeared in the dark outside the garage with his rifle, Sanctuary understood that Christopher had disregarded multiple instructions from police officers. He understood that, after learning that police officers were outside his home, Christopher had armed himself with a rifle, and positioned himself in the dark on the opposite side of the house from where Christopher believed the police to be located. Sergeant Sanctuary knew that, when his rifle light illuminated Christopher's position outside the garage, Christopher quickly ducked back inside. Those facts are undisputed. They support Sanctuary's reasonable inference that Christopher was repositioning himself to gain a

tactical advantage on the police officers outside. The circumstances surrounding Christopher's retreat were such that an objectively reasonable police officer would conclude that Christopher posed a threat of serious physical harm not only to Sanctuary, but to LaPlaca, when he turned, raised his rifle to a shooting position and aimed it in their direction.

Factor Two. Plaintiff contends that factor two – whether a warning was given – favors her. She concedes that Sergeant Sanctuary yelled "don't move," but says that warning was insufficient because Sanctuary did not tell Christopher to drop his weapon, or warn him that the use of deadly force was imminent. Plaintiff's argument is not supported.

The evidentiary record is unclear with respect to what police officers yelled at Christopher when he appeared outside the garage exit door bearing a rifle. The OIS Report states that several officers overheard yelled commands to Christopher to drop the weapon. See, e.g., Document No. 26-5 at 24 (noting that prior to firing, "Sergeant Sanctuary and Deputy Checchi both yelled commands for Mr. Tkal to stop and to drop his weapon"); see also id. at 8 ("Officers Waltrous, LaBelle, and Tuttle each heard someone call out multiple commands to 'drop the gun'"). And while Officer LaPlaca recalled that commands were yelled, he "was focused on what [he] observed and getting to safety, and . . . was just locked in on getting to a tree so

I was not in the open." Document No. 26-4 (LaPlaca Dep.) at 42:3-8. For his part, Sergeant Sanctuary testified that he "gave some commands. I believe it was, you know, our typical state police, "Don't move." Document No. 26-3 (Sanctuary Dep.) at 57:4-8.

While the precise content of the warning is arguable, the record evidence is clear that Christopher was ordered to either not move, or to drop his weapon. The evidence is also undisputed that Christopher did not comply with the substantive warning he received. Plaintiff complains that the warning was inadequate because Christopher was not explicitly warned that deadly force would be used. But, our court of appeals has instructed that so long as a warning "is clear and timely," no "particular set of magic words" is required. Conlogue, 906 F.3d at 157.

In Conlogue, 906 F.3d at 157, the plaintiff made a similar argument that "the use of lethal force was objectively unreasonable because [plaintiff] was never explicitly warned that he would be shot if he failed to put down the weapon." (internal quotations omitted). The court of appeals found that plaintiff's "suggestion lacks force." Id. at 157. The court explained, "[w]hen possible, a warning is required before a police officer resorts to the use of deadly force." Id. But, the court continued, "[w]hen — as in this case — a gun is

pointed toward officers during a standoff between an armed man and law enforcement, a warning to disarm would seem to imply that deadly force may be used if the warning is not heeded." Id. And, where the plaintiff had "received several clear and timely warnings to drop his weapon, and he chose to ignore them," "[n]o more was exigible." Id. at 157.

Given the speed at which the events unfolded here, and that Christopher unquestionably received some warning from police officers on the scene just before Sergeant Sanctuary fired his weapon, and that Christopher failed to comply with the warnings and instructions he was given, the warning that Christopher received was "adequate in light of the circumstances." Conlogue, 906 F.3d at 156.

Factor One. Finally, the court turns to plaintiff's arguments concerning factor one. Factor one – "whether a reasonable officer on the scene could believe that the suspect posed an immediate threat to police officers or civilians,'" Rahim v. Doe, 51 F.4th at 414 – is "often the most important." Ptak v. Patten-Steiger, No. 4:23-CV-11423-MRG, 2026 WL 771972, at *9 (D. Mass. Mar. 19, 2026) (citing Vos v. City of Newport Beach, 892 F.3d 1024, 1031-32 (9th Cir. 2018) ("The most important factor ... is whether [the suspect] posed an immediate threat to the safety of officers or others."); Conlogue, 906 F.3d at 159 (concluding that qualified immunity applied when an

"armed individual took actions that placed officers at imminent risk of serious bodily harm")).

Plaintiff contends that factor one raises material issues of fact and cannot be resolved on summary judgment. But, accepting plaintiff's version of the facts, and drawing all reasonable inferences in her favor, factor one still weighs in favor of Sergeant Sanctuary.

Plaintiff's argument concerning this factor is largely focused on the instant that Sergeant Sanctuary fired his weapon. But, as the Supreme Court recently explained:

> The "totality of the circumstances" inquiry into a use of force has no time limit. Of course, the situation at the precise time of the shooting will often be what matters most; it is, after all, the officer's choice in that moment that is under review. But earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones. . . . [T]hose later, "in-the-moment" facts cannot be hermetically sealed off from the context in which they arose.

Barnes, 605 U.S. at 80 (internal quotation marks and citation omitted). Plaintiff largely fails to take into account the broader and particularly relevant circumstances that led Sergeant Sanctuary to conclude that Christopher posed an imminent and potentially fatal threat to his safety, and to the safety of the other officers on the scene.

Additionally, plaintiff's arguments either lack support in the record or are contradicted by the evidence. For example,

plaintiff argues that Sergeant Sanctuary's testimony regarding what he could observe immediately before firing his weapon is disputed. According to plaintiff, Sanctuary's testimony that he saw Christopher raise his arms, and aim his gun at the troopers is contradicted by the OIS Report's visual depiction showing where Sanctuary was standing the moment he fired his weapon. Based on that graphic, plaintiff surmises, "it is rather suspect that [Sanctuary] would be able to see Christopher from his position and distance (approximately over 70 feet) through small garage windows given the lighting conditions."

In St. Hilaire v. City of Laconia, 885 F. Supp. 349, 357 (D.N.H.), aff'd, 71 F.3d 20 (1st Cir. 1995), the district court addressed a similar argument in a similar context, a Section 1983 claim involving a police officer's use of deadly force. In St. Hilaire, plaintiff asserted that the decedent lacked sufficient time to draw his weapon, and "that the position of his body when he was shot demonstrates that he could not have been reaching for his gun." Id. at 356-57. Like here, the record in St. Hilaire "contain[ed] no direct evidence to contradict [the police officer's] testimony that he shot [the decedent] only after he reached for his weapon." Id. The court determined, because "plaintiff's assertions that [the decedent] lacked sufficient time to draw his weapon amount[ed] to little more than speculation," "they are insufficient by themselves to

create a genuine dispute as to whether [the defendant] reasonably believed he had to use deadly force . . . to defend himself." Id.

Even more so, here. Plaintiff points to no direct, admissible evidence that suggests Sergeant Sanctuary could not see Christopher from his vantage point. Instead, she merely speculates that Sergeant Sanctuary was unable to see Christopher from where he was standing. Such speculation is "insufficient by [itself] to create a genuine issue as to whether [Sanctuary] reasonably believed he had to use deadly force" to defend himself. St. Hilaire, 885 F. Supp. at 357. Cf., Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018) ("[t]he test for summary judgment is steeped in reality. ... We have interpreted Rule 56 to mean that the evidence illustrating the factual controversy cannot be conjectural or problematic.... [S]ummary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.") (internal quotations omitted).

Sergeant Sanctuary's testimony concerning his visual perspective finds support in the record, specifically the testimony of Trooper LaPlaca. LaPlaca stated that, as he returned from his second meeting with Lisa and approached Sanctuary's location, he was "able to see the garage, I'm able to see the room with the light on in the furthest back. So I'm

not in [Sanctuary's] position, but as I'm [approaching Sanctuary's location,] I'm able to see the garage and observe what the garage looks like and the light in the back." Document No. 26-4 (LaPlaca Dep.) at 37:16-22. LaPlaca further explained that, when he was standing next to Sergeant Sanctuary, LaPlaca could "see in the way back of the garage that there was a light on, and he had a better vantage point than me at that time . . . . I was able to see in the garage near Sergeant Sanctuary, his tree." Id. at 34:1-9.

There is no genuine issue of material fact with respect to Sanctuary's ability to see Christopher in the moments before the shooting.

Plaintiff next argues that Sergeant Sanctuary's testimony concerning his view of Christopher through the garage windows is internally contradictory. She says that Sanctuary testified that he could see Christopher's "arms kind of lifting up, in a motion of aiming the rifle at me," but also testified that he could only see Christopher from his shoulders to his head. If Sanctuary could only see Christopher from his shoulders up, plaintiff notes, how then could he have seen Christopher's arms move?

Sergeant Sanctuary's testimony is not contradictory. He testified that, as Christopher moved into the garage, Sanctuary was able to see from the tops of Christopher's shoulders and

above. See Document No. 26-3 (Sanctuary Dep.) at 57:25–58:5. Sanctuary was able to see that Christopher remained armed because the muzzle on his rifle was visible. Id. at 57:25–58:5. Sanctuary observed Christopher turn to face him, lift his arms, and aim the rifle.[9] Id. at 58:6–9. Sanctuary was able to see Christopher aim his rifle because those movements were visible at (or above) Christopher's shoulders.

Finally, plaintiff argues that the evidence suggests Christopher was not actually standing where Sergeant Sanctuary placed him at the moment Sanctuary fired his weapon (beside the double doors). In support, she points to evidence in the OIS Report that the bullets fired by Sanctuary struck the door behind which Christopher's body was found. But that evidence does not contradict Sanctuary's testimony. Sanctuary testified that, as he began to fire his weapon at Christopher, Christopher moved behind the door frame. Sanctuary said he then tracked Christopher's movement with his rifle. Document No. 26-3 (Sanctuary Dep.) at 65:24-66: ("as I fired, he tracked – as I'm looking at it, he's moving from my left to right, behind – which it looked like the doorframe, like he's in the doorway and he's moving, like, to the doorframe area, behind the doorframe. And

---

[9] Most typically, a rifle is "aimed" by raising it to the shooter's shoulder, and moving the sights to align with the target.

I – I tracked as he moved to the right.”). So, Sanctuary’s testimony concerning Christopher’s location at the moment he began firing is consistent with the bullets hitting the door behind which Christopher’s body was found, since Sanctuary testified that Christopher moved once Sanctuary fired.

But, even if Christopher was not standing in the exact location where Sanctuary placed him at the moment Sanctuary fired his weapon, that fact would not alter the conclusion with respect to the reasonableness of Sanctuary’s assessment of the imminent risk that Christopher posed. That is, where Christopher was located at the exact moment he raised his rifle and Sanctuary fired his weapon does not undermine Sanctuary’s reasonable determination that Christopher posed a serious threat to his physical safety. Sergeant Sanctuary’s assessment of the threat that Christopher posed took into account several contributing factors.

As discussed, the “history of the interaction, as well as other past circumstances known to the officer . . . may inform the reasonableness of the use of force.” Barnes, 605 U.S. at 80. Here, multiple considerations – the majority of which are largely undisputed in the factual record – could have been weighed in Sanctuary’s assessment of the threat that Christopher posed. Those considerations included, but are not limited to: Christopher had violently threatened his wife by holding a

kitchen knife to her neck; Christopher repeatedly refused to obey direct police orders; Christopher armed himself with a rifle after the police arrived on the scene; instead of surrendering to police officers located in the front of the house (where the home's front entrance was illuminated), Christopher exited the house through a back exit in the dark, while carrying a rifle in ready position; Christopher had quickly ducked back into the garage after he was illuminated by Sanctuary's rifle light; and, finally, Sanctuary watched Christopher turn toward him, raise his rifle, and take aim at him and LaPlaca.

Our court of appeals has instructed, "a party cannot survive summary judgment simply by asserting that a jury might disbelieve the moving party's evidence. The non-moving party . . . must instead present sufficient affirmative evidence of its own to create material issues of fact." Bannon, 99 F.4th at 83. In that regard, plaintiff falls short. The undisputed evidence suggests that, under "tense, uncertain, and rapidly evolving circumstances," Sergeant Sanctuary made a "split-second judgment that deadly force was necessary to protect" himself and Officer LaPlaca. Id. And, based on that undisputed evidence, no reasonable jury could conclude that Sanctuary's action in the moment constituted unreasonable force.

"Under the totality of the circumstances, no reasonable jury could conclude that [Sergeant Sanctuary] acted unreasonably in employing deadly force against [Christopher] in violation of the Fourth Amendment." Bannon, 99 F.4th at 84. Thus, Sergeant Sanctuary is entitled to judgment on plaintiff's excessive force claim against him.

2. Qualified Immunity: Unlawfulness "Clearly Established"

Even if Sergeant Sanctuary did violate Christopher's Fourth Amendment rights, he is entitled to qualified immunity, and summary judgment is warranted on that basis as well.

The qualified immunity doctrine shields state officials, including police officers like Sanctuary, from liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Rivas-Villegas v. Cortesluna, 595 U.S. 1, 5 (2021) (per curium) (further quotations omitted). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." Rahim v. Doe, 51 F.4th at 410 (quoting City of Tahlequah v. Bond, --- U.S. ----, 142 S. Ct. 9, 11 (2021) (per curiam)) (further quotations omitted).

The qualified immunity analysis is two-pronged. It requires the court to ask: "(1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was 'clearly established' at the time of the alleged

violation." Rahim, id. at 410 (quoting Conlogue v. Hamilton, 906 F.3d 150, 155 (1st Cir. 2018)). "The prongs need not be addressed in order, and an officer may be entitled to immunity based on either prong." Id.

In addressing the second prong of the qualified immunity inquiry, the court must ask whether the violated constitutional right was "clearly established" at the time of the alleged violation. "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (internal quotation marks and citation omitted).

In Bannon v. Godin, the Court of Appeals for the First Circuit explained that, in actions involving an alleged violation of the Fourth Amendment:

> the '[s]pecificity' of the rule set forth in such precedent 'is especially important,' because it can be 'difficult for an officer to determine how the relevant legal doctrine,' such as excessive force, 'will apply to the factual situation the officer confronts.'" Lachance v. Town of Charlton, 990 F.3d 14, 21 (1st Cir. 2021) (alteration in original) (quoting City of Escondido v. Emmons, 586 U.S. 38, 42 (2019)). Thus, outside of obvious cases, "'relevant case law,' where 'an officer acting under similar circumstances ... was held to have violated the Fourth Amendment,' is 'usually necessary' to overcome officers' qualified immunity." Id. (omission in original) (quoting Wesby, 583 U.S. at 64). The plaintiff bears the burden of "identify[ing] controlling authority or a consensus of persuasive authority sufficient to put the officers on notice

> that their conduct violated the law." Rahim, 51 F.4th at 412.

99 F.4th at 85.

The plaintiff relies principally on McKenney v. Mangino, 873 F.3d 75, 82 (1st Cir. 2017), in support of her claim. While a case need not be "directly on point' to satisfy the second step of the qualified immunity paradigm," id. at 82, McKenney is not sufficiently "particularized to the facts of [this] case" to place Sergeant Sanctuary on notice that his conduct was violative of clearly established Fourth Amendment law. Id.

In McKenney, the Court of Appeals for the First Circuit considered whether an officer was entitled to qualified immunity after he shot a man who was dangling a gun by his side, pointing it at the ground while "weav[ing] haphazardly into and out of his house." 873 F.3d at 84, 79. The plaintiff in McKenney did not make "any sudden or evasive movements and was not pointing his gun at anyone," and "was suicidal, armed, slow in gait, some distance away from the officer, and had received no commands or warnings for several minutes." McKenney, 873 F.3d at 83. The First Circuit found, under those circumstances, that any threat posed by the plaintiff "lacked immediacy and alternatives short of lethal force remained open." Id.

The circumstances that rapidly unfolded in Walpole on February 19 and 20 bear little resemblance to the facts in

McKenney, beyond their tragic consequences. After observing the police officers gathered around his home, Christopher disregarded their explicit commands and instead returned inside the house. He armed himself with a rifle. When he reappeared outside at the house's back entrance, now carrying the rifle, Trooper LaPlaca believed Christopher posed such an urgent threat to his safety that LaPlaca immediately dropped his phone, and rushed to take cover. When Christopher was illuminated by Sergeant Sanctuary's rifle light, he again disregarded police warnings to submit or disarm. Instead, he darted back inside the house. Finally, and critically, Christopher aimed his rifle at the troopers. As the First Circuit noted when distinguishing McKenney in Conlogue: "the presence of a pointed firearm changes the calculation. When an individual is pointing a loaded firearm, anyone within firing range is in proximity to the life-threatening danger." Conlogue, 906 F.3d at 158.

McKenney is plainly distinguishable. And, plaintiff fails to identify any other authority that might clearly establish her decedent's right not to have been fired at under the then prevailing circumstances. Therefore, she has not met her "burden to identify controlling authority or a consensus of persuasive authority sufficient to put the officers on notice that their conduct violated the law." Rahim, 51 F.4th at 412.

Thus, although the court has determined that Sergeant Sanctuary's conduct did not violate the Fourth Amendment, even if it had, Sergeant Sanctuary is entitled to summary judgment based on qualified immunity.

## Conclusion

For the foregoing reasons, as well as those set forth in defendant's memoranda (documents no. 26-1 and 32), Sergeant Sanctuary is entitled to judgment on plaintiff's claim against him. Accordingly, his motion for summary judgment (document no. 26) is **GRANTED**.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

Steven J. McAuliffe
United States District Judge

November 3, 2026

cc: Counsel of Record